# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

TAURSHIA SIMMONS and NAVID KALATIZADEH,

Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

AMBIT ENERGY HOLDINGS, LLC, AMBIT TEXAS, LLC, AMBIT MARKETING, LLC, AMBIT NEW YORK, LLC, JERE W. THOMPSON, and CHRIS CHAMBLESS,

Defendants.

No. 13 Civ. 6240 (JMF) (FM)

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**WITTELS LAW, P.C.**
Steven L. Wittels
J. Burkett McInturff
18 HALF MILE ROAD
ARMONK, NEW YORK 10504
Telephone: (914) 319-9945
Facsimile: (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com

*Attorneys for Plaintiffs and the Class*

Dated: February 14, 2014

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ............................................................................................................. 3

I.     THE PERSONAL JURISDICTION CHALLENGE BY INDIVIDUAL
       DEFENDANTS THOMPSON AND CHAMBLESS SHOULD BE DENIED ................ 3

II.    DEFENDANTS HAVE FAILED TO ESTABLISH THE LOCAL CONTROVERSY
       EXCEPTION TO CAFA JURISDICTION ...................................................... 7

       A.     Defendants Have Not Met Their Burden to Show That the Principal
              Injuries From Defendants' Conduct Are Confined to New York.
              Instead, Defendants' Alleged Wrongful Conduct Is Nationwide. ......................... 9

       B.     Defendants Have Not Met Their Burden to Show That Ambit New York
              Is a "Significant Defendant."  Instead, the Evidence Shows That the
              Texas Defendants Are Responsible for Plaintiffs' Injuries and Are the
              Only Defendants Capable of Providing Plaintiffs with a Full Recovery............. 13

              1.    *Ambit New York's Conduct Is Not a Significant Basis for This Action* ......... 14

              2.    *Plaintiffs Do Not Seek Significant Relief from Ambit New York* ................... 20

III.   DEFENDANTS' MERE DEPARTMENT AND VEIL PIERCING ARGUMENTS
       ARE OFF BASE AND SHOULD BE DISREGARDED – THE LAW ALLOWS
       PLAINTIFF TO SUE THE TEXAS DEFENDANTS DIRECTLY ................................ 22

IV.    THE COMPLAINT STATES VALID CLAIMS FOR RELIEF UNDER
       NEW YORK'S CONSUMER PROTECTION LAWS ..................................................... 24

       A.     Legal Standard ...................................................................................... 24

       B.     The Complaint Does Not Use Group Pleading..................................................... 25

       C.     The Complaint More Than Adequately Pleads Violations of
              GBL § 349-d(6) – Count I. .................................................................... 26

       D.     Defendants Violated GBL § 349-d(7) – Count II. ................................................ 29

       E.     The Complaint Sets Forth Numerous Deceptive Practices Prohibited
              by Sections 349 and 349-d(3) – Counts III and IV. .............................................. 30

       F.     Plaintiffs' Unjust Enrichment Claims Should Not Be Dismissed. ....................... 35

CONCLUSION.......................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Ackerman v. Coca–Cola Co.*,
2010 WL 2925955 (E.D.N.Y. July 21, 2010) ................................................................. 31, 32

*Anthony v. Small Tube Mfg. Corp.*,
535 F. Supp. 2d 506 (E.D. Pa. 2007) ................................................................................. 8

*APWU v. Potter*,
343 F.3d 619 (2d Cir. 2003) .............................................................................................. 11

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009) ....................................................................................................... 24

*Ava Acupuncture P.C. v. State Farm Mut. Auto. Ins. Co.*,
592 F. Supp. 2d 522 (S.D.N.Y. 2008) ................................................................... 13, 16, 20

*Basquiat v. Kemper Snowboards*,
1997 WL 527891 (S.D.N.Y. Aug. 25, 1997) ...................................................................... 5

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................... 24

*BH Seven, LLC v. Ambit Energy, L.P.*,
No. 11 Civ. 02483 (E.D.N.Y. Aug. 14, 2012) ................................................................... 4

*Bildstein v. MasterCard, Int'l, Inc.*,
329 F.Supp.2d 410 (S.D.N.Y. 2004) .................................................................................. 34

*Blanchard v. Lee*,
2013 WL 4459866 (E.D. La. Aug. 15, 2013) ..................................................................... 25

*Brook v. UnitedHealth Group Inc.*,
2007 WL 2827808 (S.D.N.Y. Sep. 27, 2007) ................................................................. 9, 10

*Casey v. Int'l Paper Co*,
2008 WL 8854569 (N.D. Fla. Jan. 7, 2008) ....................................................................... 20

*City of New York v. Smart Apartments LLC*,
959 N.Y.S.2d 890 (Sup. Ct. 2013) ..................................................................................... 22

*Coleman v. Estes Exp. Lines, Inc.*,
631 F.3d 1010 (9th Cir. 2011) ...................................................................................... 19, 21

*College of Dental Surgeons of Puerto Rico v. Triple S Mgmt., Inc.*,
2011 WL 414991 (D. Puerto Rico Feb.8, 2011) ........................................................... 11, 12

*DeHart v. BP Am., Inc.*,
    2010 WL 231744 (W.D. La. Jan. 14, 2010) ............................................................ 8

*Evans v. Walter Indus., Inc.*,
    449 F.3d 1159 (11th Cir. 2006) .............................................................. 14, 16, 20

*Hart v. Rick's NY Cabaret Int'l, Inc.*,
    2014 WL 301357 (S.D.N.Y. Jan. 28, 2014) ............................................................ 7

*Hines v. Overstock.com, Inc.*,
    2013 WL 4495667 (E.D.N.Y. Aug. 19, 2013) ....................................................... 33

*Holmes v. Allstate Corp.*,
    2012 WL 627238 (S.D.N.Y. Jan. 27, 2012) ......................................................... 25

*Hypnoxico, Inc. v. Colorado Altitude Training, LLC*,
    2003 WL 21649437 (S.D.N.Y. July 14, 2003) .................................................... 5, 6

*In re Barnet*,
    737 F.3d 238 (2d Cir. 2013) ............................................................................... 27

*In re Digital Music Antitrust Litig.*,
    812 F. Supp. 2d 390 (S.D.N.Y. 2011) ................................................................. 23

*In re Sprint Nextel Corp.*,
    593 F.3d 669, 673 (7th Cir. 2010) ........................................................................ 8

*Karabu Corp. v. Gitner*,
    16 F. Supp. 2d 319 (S.D.N.Y. 1998) ..................................................................... 6

*Karlin v. IVF Am., Inc.*,
    93 N.Y.2d 282 (1999) .................................................................................... 3, 34

*Kearns v. Ford Motor Co.*,
    2005 WL 3967998 (C.D. Cal. Nov. 18, 2005) ................................................. 12, 17

*Kinetic Instruments, Inc. v. Lares*,
    802 F. Supp. 976 (S.D.N.Y. 1992) ........................................................................ 5

*Koch v. Acker, Merrall & Condit Co.*,
    18 N.Y. 3d 940 (2012) ....................................................................................... 31

*Kreutter v. McFadden Oil Corp.*,
    71 N.Y.2d 460 (1988) .......................................................................................... 5

*Lancaster v. Daymar Colls. Grp., LLC*,
    2011 WL 2437774 (W.D. Ky. Mar. 14, 2012) ...................................................... 8

iii

*LeBlanc v. Cleveland,*
    198 F.3d 353 (2d Cir. 1999).................................................................... 11

*Lebowitz v. Dow Jones & Co.,*
    508 F. App'x 83 (2d Cir. 2013) ............................................................... 33

*L'Esperance v. HSBC Consumer Lending, Inc.,*
    2012 WL 2122164 (D.N.H. June 12, 2012).............................................. 25

*Licci v. Lebanese Canadian Bank,*
    732 F.3d 161 (2d Cir. 2013)................................................................... 4, 6

*Mattera v. Clear Channel Commc'ns, Inc.,*
    239 F.R.D. 70 (S.D.N.Y. 2006) ........................................................ *passim*

*Maurizio v. Goldsmith,*
    230 F.3d 518 (2d Cir. 2000)................................................................... 31

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young,*
    1994 WL 88129 (S.D.N.Y. Mar. 15, 1994) ............................................. 25

*Morin v. Trupin,*
    747 F. Supp. 1051 (S.D.N.Y. 1990)........................................................ 22

*Murray Space Shoe Corp. v. FTC,*
    304 F.2d 270 (2d Cir. 1962)................................................................... 32

*New Jersey Carpenters Vacation Fund v. HarborView Mortgage Loan Trust 2006-4,*
    581 F. Supp. 2d 581 (S.D.N.Y. 2008)...................................................... 8

*Noresin AB v. ICC Indus., Inc.,*
    1991 WL 161367 (S.D.N.Y. Aug. 16, 1991) ........................................... 23

*Ontel Prods., Inc. v. Project Strategies Corp.,*
    899 F. Supp. 1144 (S.D.N.Y. 1995)......................................................... 6

*Opelousas General Hosp. Authority v. FairPay Solutions, Inc.,*
    655 F.3d 358. 360 (5th Cir. 2011) ..................................................... 9, 18

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,*
    85 N.Y.2d 20 (1995) .............................................................................. 31

*Pelman ex rel. Pelman v. McDonald's Corp.,*
    396 F.3d 508 (2d Cir. 2005).................................................................. 31

*Preston v. Tenet Healthsystem Mem'l Med. Ctr. Inc.,*
    485 F.3d 793, 797 (5th Cir. 2007) .......................................................... 8

*Pullman v. Alpha Media Pub., Inc.*,
  2013 WL 1290409 (S.D.N.Y. Jan. 11, 2013) ...................................................................... 23

*Quinn v. Walgreen Co.*,
  2013 WL 4007568 (S.D.N.Y. Aug. 7, 2013) ................................................................. 24, 31

*Rainbow Apparel Distributor Center Corp. v. Gaze U.S.A., Inc.*,
  295 F.R.D. 18, 2013 (E.D.N.Y. 2013) .................................................................................. 5

*Retail Software Services, Inc. v. Lashlee*,
  854 F.2d 18 (2d Cir. 1988) ................................................................................................... 5

*Richins v. Hofstra Univ.*,
  908 F. Supp. 2d 358 (E.D.N.Y. 2012) .................................................................................. 8

*Robinson v. Cheetah Transp.*,
  2006 WL 468820 (W. D. La. Feb.27, 2006) ........................................................................ 20

*Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*,
  748 F.2d 774 (2d Cir. 1984) ................................................................................................ 24

*Shovak v. Long Island Commercial Bank*,
  50 A.D.3d 1118 (N.Y. App. Div. 2008) .............................................................................. 33

*Sims v. First Consumers Nat. Bank*,
  303 A.D.2d 288 (1st Dep't 2003) ........................................................................................ 31

*Soviet Pan Am Travel Effort v. Travel Comm., Inc.*,
  756 F. Supp. 126 (S.D.N.Y. 1991) ....................................................................................... 5

*Standard Fire Ins. Co. v. Knowles*,
  133 S. Ct. 1345 (2013) .......................................................................................................... 7

*State by Lefkowitz v. Bevis Indus., Inc.*,
  63 Misc. 2d 1088 (Sup. Ct. 1970) ....................................................................................... 35

*Teller v. Bill Hayes, Ltd.*,
  213 A.D.2d 141 (2d Dep't 1995) ......................................................................................... 31

*Valentín v. Hosp. Bella Vista*,
  254 F.3d 358 (1st Cir. 2001) ............................................................................................... 11

*Villalpando v. Exel Direct Inc.*,
  2012 WL 5464620 (N.D. Cal. Nov. 8, 2012) ...................................................................... 12

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
  751 F.2d 117 (2d Cir. 1984) ................................................................................................ 22

*Waller v. Hewlett-Packard Co.*,
    2011 WL 8601207 (S.D. Cal. May 10, 2011) ........................................................................ 12

*Watts v. Jackson Hewitt Tax Serv. Inc.*,
    579 F. Supp. 2d 334 (E.D.N.Y. 2008) ................................................................................. 34

*Wilner v. Allstate Ins. Co.*,
    71 A.D.3d 155 (2010) ....................................................................................................... 34

*Wise v. Energy Plus Holdings*,
    No. 11 Civ. 7345 (S.D.N.Y Mar. 29, 2012) ....................................................................... 33

*Zuckerman v. BMG Direct Mktg., Inc.*,
    737 N.Y.S.2d 14, 15 (2002) .............................................................................................. 33

**Statutes**

28 U.S.C. § 1332(d)(4)(A) ............................................................................................ 8, 9, 13
N.Y. Gen. Bus. Law § 349 ................................................................................................... 2, 7
N.Y. Gen. Bus. Law § 349-d ........................................................................................... *passim*

## PRELIMINARY STATEMENT

With the deregulation of the State's retail energy markets in 1996, a flood of new electric and gas suppliers called energy service companies, or "ESCOs," have come to the State to compete against traditional utilities. Second Am. Compl. ("SAC") ¶ 58. This class action results from an ESCOs' exploitation of deregulation through a classic bait and switch. Defendants entice consumers away from utilities like Con Edison with the promise of "guaranteed savings" of at least 1% compared to what the utilities charge, or consumers will receive a check for the difference. SAC ¶ 3.[1] But unbeknownst to consumers, Defendants systematically overstate what the utility would have charged, thus depriving customers of their full 1% (or more) savings. SAC ¶ 4. To make matters worse, when Defendants' inflated rates surpass even their fictitious utility rate, thus requiring that consumers be issued a refund, Defendants make consumers wait a year or more for the refund check. SAC ¶ 5. While Defendants have implemented these two deceptive practices since entering the New York market in 2007, in 2011 Defendants developed yet another way to dishonor their guaranteed savings promise. SAC ¶ 6. Defendants instituted a policy that automatically defaults customers signed up for their energy plan called the "Guaranteed Savings Plan" into a new, more expensive, non-guaranteed plan called the "New York Select Variable Plan" (hereafter the "Variable Plan"). SAC ¶ 6.

The Variable Plan is "select" only inasmuch as Defendants use it to select Guaranteed Savings Plan customers for even higher energy rates. SAC ¶ 7. New customers cannot sign up for the Variable Plan directly, and Defendants neither advertise nor offer the Variable Plan in their marketing materials or on their website. SAC ¶ 7. Defendants' automatic default is the only way a customer becomes a member of the Variable Plan. SAC ¶ 7.

---

[1] "Defendants" refers to all Defendants, unless otherwise specified.

All three of Defendants' deceptive policies violate not only New York's general consumer fraud statute, Gen. Bus. Law § 349, but also a newly-enacted consumer protection statute targeting abuse in the ESCO market. The new law, whose drafters explicitly recognized that the deregulation of New York's energy markets has resulted in the need "to weed out companies whose business model is based on taking unfair advantage of consumers," is called the Energy Services Company Consumers Bill of Rights, Gen. Bus. Law § 349-d. [2]

Seeking to further delay New York's energy consumers the savings they were guaranteed, Defendants' motions to dismiss ignore well pleaded allegations and controlling case law. First, simply wishing away the Complaint's extensive jurisdictional allegations, Individual Defendants Jere Thompson (CEO) and Chris Chambless (Chief Marketing Officer) invoke the long-discredited fiduciary shield doctrine. Second, relying on the terms of a contract declared void by Section 349-d, the five Texas Defendants and the one New York Defendant, Ambit New York, proffer the argument that this action – by New York consumers defrauded by a web of Texas-based companies operating out of a single Dallas office – involves issues that are so localized that this case meets the narrow tests of the CAFA's local controversy exception. Hardly. This action clearly has *national* implications because Defendants have implemented the *same* deceptive policies from their Dallas headquarters throughout the nation.

Moreover, the mere shell that is the New York defendant, cannot return Plaintiffs' money and is simply too insignificant a Defendant to negate the otherwise inescapable fact that "Ambit Energy," as the uniformly-branded commodity is sold to consumers, is brought to New York by

---

[2] Plaintiffs' Complaint states five causes of action: (1) violations of Section 349-d(6)'s requirement that all material changes in contracts for residential energy services be expressly consented to by consumers; (2) violations of Section 349-d(7)'s requirement that all variable charges in contracts and marketing for residential energy be clearly and conspicuously delineated; (3) violations of Section 349-d(3)'s prohibition of deceptive acts in the marketing of residential energy services; (4) violations of Section 349's general prohibition of deceptive business conduct; and (5) unjust enrichment. SAC, Counts I to V.

a Texas outfit. Finally, Defendants' no-holds-barred attack on the adequacy of Plaintiffs' pleading under the permissive Rule 8, and their "see if it sticks" mischaracterization of both fact and law cannot undermine the reality that New York's consumer protection statutes "on their face apply to virtually all economic activity, and . . . [t]he reach of these statutes provides needed authority to cope with the numerous, ever-changing types of false and deceptive business practices which plague consumers in our State." *Karlin v. IVF Am., Inc.*, 93 N.Y.2d 282, 290-91 (1999) (citation omitted). Defendants' motions to dismiss should be denied.

<u>**ARGUMENT**</u>

## I. THE PERSONAL JURISDICTION CHALLENGE BY INDIVIDUAL DEFENDANTS THOMPSON AND CHAMBLESS SHOULD BE DENIED

Plaintiffs' Complaint contains detailed factual allegations establishing personal jurisdiction in New York for the claims challenging the Individual Defendants' unlawful conduct.[3] Specifically, the Complaint details the Individual Defendants' roles as co-founders of "Ambit," a purportedly less expensive energy supplier to consumers previously served by public utilities (SAC ¶¶ 2, 17); their personal role in formulating marketing plans and materials, pursuant to which they personally directed the New York sales activities of specially-retained Sales Consultants (SAC ¶ 52); their travel to New York from Dallas to direct "Ambit's" New York activities (SAC ¶ 52); their signatures on the 1% Savings Guarantees widely disseminated in New York (SAC ¶ 5); their inclusion of personal statements on a series of press releases expressing their satisfaction with the execution of the marketing plans they formulated (SAC ¶¶ 53, 54, 55, 56); and the execution of those marketing plans resulting in increased not decreased energy costs for New York consumers (SAC ¶¶ 3-11); their personal ownership and control of

---

[3] Although the Complaint at ¶¶ 44-45 alleges both general and specific personal jurisdiction over the Individual Defendants, Plaintiffs confine their argument to specific jurisdiction under CPLR Section 302(a), since it is not necessary to establish general jurisdiction over the Individual Defendants.

the operations of the Ambit entities named as Defendants herein (SAC p. 2 n. 1); in short, Individual Defendants' direct supervision of the conduct that harmed Plaintiffs.[4]

New York cases clearly indicate that a series of in-state acts or even a single act performed by a non-domiciliary is sufficient for long-arm jurisdiction under Section 302(a), provided that the act or acts reflect the defendant's purposeful availment of the privilege of doing business in New York, and the claims asserted against the non-domiciliary relate to that single act or series of acts. *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 168-69 (2d Cir. 2013).

There is no question that the Defendant Ambit entities are doing business in New York. There is also no question that the Individual Defendants themselves are purposefully transacting "Ambit's" business for purposes of Section 302 (a) by: (1) travelling to New York in their roles as Ambit's principal officers, (2) issuing the 1% Savings Guarantee to New York consumers, (3) personally directing the New York activities of their Sales Consultants, and (4) exercising personal control over the Ambit entities. There is also no question that the consumer fraud claims asserted here are based on the Individual Defendants' role as the drivers of "Ambit."[5]

_____

[4] Defendants argue that "The Court cannot accept as true legal conclusions couched as factual allegations" on personal jurisdiction. Defs.' Br. 2. Incredibly, Defendants simply ignore the SAC's detailed factual allegations of personal jurisdiction. Moreover, faced with this mass of detail as to their individual actions in New York, the Individual Defendants primarily rely on the recent Opinion in *BH Seven, LLC v. Ambit Energy, L.P.*, No. 11 Civ. 02483 (E.D.N.Y. Aug. 14, 2012), ECF No. 39 attached as Ex. 1 to the Declaration of Plaintiffs' Counsel Steven L. Wittels ("Wittels Decl."). That opinion lends no support to the Individual Defendants' attempt to evade personal jurisdiction here, because the BH Seven court stated that it "cannot ascertain whether there is personal jurisdiction under New York's long-arm statute or the Fourteenth Amendment" as "plaintiff has failed to allege any facts in the complaint that establish that this court has personal jurisdiction over the individual defendants . . . the Complaint fails to allege any facts suggesting that Thompson or Chambless had any contacts with New York." *Id.* at 7, 10. The present Complaint stands in stark contrast to the BH Seven complaint.

[5] Indeed, the main page of the Ambit website tries to paint a heartwarming narrative of how the Individual Defendants have led Ambit's expansion into deregulated energy markets like New York and invites visitors to read about the Individual Defendants' "journey" and how "you can become a part of this incredible and ongoing success story." *Available at*: www.ambitenergy.com; *see also* www.theambitstory.com (both sites last visited Feb. 14, 2014).

For their part, the Individual Defendants contend that "it is not enough that corporate officers have the authority to direct activities giving rise to the suit" and "travel in a corporate capacity is not sufficient for personal jurisdiction."  Seeking shelter behind the long disavowed "fiduciary shield" doctrine, Defendants mischaracterize the law and its application here.  More than a quarter of a century ago the New York Court of Appeals, in *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460 (1988), abrogated the fiduciary shield doctrine, which provided that an individual was not subject to jurisdiction if his or her dealings in the forum state were solely in a corporate capacity.  After *Kreutter*, when an officer is a primary actor in the transactions giving rise to the asserted claims, the corporate form provides no shield to jurisdiction.  *Id*. at 470-71.  Indeed, since *Kreutter*, federal courts applying Section 302(a) do not hesitate to assert personal jurisdiction over individual defendants alleged to be primary actors.[6]

Applying *Kreutter* and its progeny to the Complaint's jurisdictional allegations, this Court may properly exercise personal jurisdiction over the Individual Defendants based on their business contacts in New York as active participants in the Ambit entities' unlawful conduct.[7]

---

[6] *Retail Software Services, Inc. v. Lashlee*, 854 F.2d 18, 19-22 (2d Cir. 1988) (applying *Kreutter* to assert personal jurisdiction over corporate officers from California who fraudulently sold franchises in New York on behalf of their employer, when officers had knowledge, consent, and control over the transactions); *Soviet Pan Am Travel Effort v. Travel Comm., Inc.*, 756 F. Supp. 126, 130-31 (S.D.N.Y. 1991) (applying *Kreutter* to assert personal jurisdiction over non-resident corporate officers); *Kinetic Instruments, Inc. v. Lares*, 802 F. Supp. 976, 983-84 (S.D.N.Y. 1992) (applying *Kreutter* to find corporate employer to be an agent for non-resident corporate officer to establish personal jurisdiction over officer); *Basquiat v. Kemper Snowboards*, 96 Civ. 0185 (LAP), 1997 WL 527891, at *2 (S.D.N.Y. Aug. 25, 1997) (same; "a corporation can act as an agent for an individual for purposes of § 302(a)(1)"); *Hypoxico, Inc. v. Colorado Altitude Training, LLC*, No. 02 Civ. 6191 (JGK), 2003 WL 21649437, at **6-7 (S.D.N.Y. July 14, 2003) (personal jurisdiction may be established through the individual defendant's own contacts with the state, or personal jurisdiction over the corporation could be imputed to the officer under an agency theory); *Rainbow Apparel Distributor Center Corp. v. Gaze U.S.A., Inc.*, 295 F.R.D. 18, 26-27 (E.D.N.Y. 2013) (jurisdiction asserted over high-ranking corporate officer who was the driving force behind, and stood to benefit personally from, transactions in New York that were the basis for claims asserted).

[7] Alternatively, the Court may exercise personal jurisdiction over Thompson and Chambless based on Ambit Energy's activities in New York as their agent.  Where, as here, an officer of an entity has

*Footnote continued on next page.*

The Individual Defendants were not remotely-placed corporate officials with no involvement in the relevant transactions; as CEO and Chief Marketing Officer they actively participated in and directed the very conduct that Plaintiffs challenge here. (SAC ¶¶ 3 - 11, 52 - 56).[8]

Exercise of personal jurisdiction over the Individual Defendants in this action also satisfies constitutional due process. As set forth above, it is alleged that the Individual Defendants personally directed Ambit's New York conduct and travelled to New York on a number of occasions in this regard. The Individual Defendants thus purposefully directed their activities at New York, which are sufficient minimum contacts. *Licci*, 732 F.3d at 173. The exercise of jurisdiction is also reasonable. Litigating this case in New York may be an inconvenience to the Individual Defendants, but that sole factor is not dispositive. The Individual Defendants consciously decided to participate in New York's retail energy market. Further, even if jurisdiction were not asserted over the Individual Defendants, litigation of

knowledge of and consent to transactions carried out in the forum state by an entity over which the officer exercises control, the agency relationship is established. *Hypoxico*, 2003 WL 21649437, at **3-4.

[8] The cases on which the Individual Defendants rely do not support their argument. *Ontel Prods, Inc. v. Project Strategies Corp.*, 899 F. Supp. 1144, 1148-49 (S.D.N.Y. 1995), actually held that mere allegations that the individual defendant "likely possessed" the authority to direct those activities were insufficient. The court went on to state that allegations that the defendant president "personally took part in the activities giving rise to the action" would be sufficient. The Complaint is also easily distinguished from *Karabu Corp. v. Gitner*, 16 F. Supp. 2d 319 (S.D.N.Y. 1998), in which the court found that the pleadings contained no factual allegations that the individual defendants were "primary actor[s] in the transaction in New York" that gave rise to the litigation, and not merely "some corporate employee[s]. . . who played no part in" it. 16 F. Supp. 2d at 323. *Virgin Enters. Ltd. v. Virgin Eyes LAC*, No. 08 Civ. 8564, 2009 WL 3241529, at *4 (S.D.N.Y. September 30, 2009) held that mere advertising on a "passive website" not directed particularly to New York was insufficient for personal jurisdiction, while here the Complaint alleges far more than "mere advertising." *Tradition Chile Agentes de Chile Ldta. V. ICAP Sec. USA, LLC*, No. 09 Civ. 10343 (WHP). 2010 WL 4739938, at *5 (S.D.N.Y. 1992) holds that an employee's travel in a corporate capacity is not enough, standing alone, for personal jurisdiction, while here the Complaint alleges much more than the Individual Defendants' travel to New York in a corporate capacity. *Kinetic Instruments, Inc. v. Lares,* 802 F. Supp. 976, 982 (S.D.N.Y. 1992) held that personal jurisdiction over the corporate president could not be asserted where he did not personally sell the offending product, but was properly asserted over him because the corporation acted as his agent.

Plaintiffs' claims will proceed against the Ambit entity Defendants, who do not challenge personal jurisdiction. As the Individual Defendants will be key witnesses and subjects of extensive discovery on claims litigated in New York regardless, joinder of Plaintiffs' claims against the Individual Defendants with the claims against the Ambit entities does not make the litigation meaningfully more burdensome for the Individual Defendants.

Litigation of Plaintiffs' claim in New York also vindicates the public policy of protecting consumers as evidenced in GBL Section 349, both in general and in the specific ESCO consumer protections of Section 349-d. The important public policy of protecting consumers from deceptive business conduct, including deceptive conduct perpetrated by non-residents, should not be frustrated by the fact that the non-residents now find it inconvenient to defend themselves in New York, where their conduct was directed and inflicted substantial injury. Finally, Plaintiffs and the Class have an important interest pursuing their claims in New York. The Individual Defendants exploited the privilege of doing business here. They should not be allowed to drag Plaintiffs to Texas after causing harm in New York. Fairness does not require that these claims be litigated in Texas; indeed, fairness requires that these claims be decided in New York.

## II. DEFENDANTS HAVE FAILED TO ESTABLISH THE LOCAL CONTROVERSY EXCEPTION TO CAFA JURISDICTION

It is Defendants' "burden," as they acknowledge (Defs.' Br. 7), to "prove" that this case is one of the rare instances where a CAFA exception divests a federal court of jurisdiction.[9] Defendants fail to meet their burden for three reasons. First, Defendants have failed to prove by

---

[9] *See Hart v. Rick's NY Cabaret Int'l, Inc.*, – F. Supp. 2d –, No. 09 Civ. 3043 (PAE), 2014 WL 301357, at *3 (S.D.N.Y. Jan. 28, 2014) (party opposing jurisdiction bears burden of proving CAFA exception). Defendants concede as well that Plaintiffs have established the prerequisites to this Court's CAFA jurisdiction: (1) the class has more than 100 members, (2) the parties are minimally diverse, and (3) the matter in controversy exceeds the sum or value of $5,000,000. *Standard Fire Ins. Co. v. Knowles*, 133 S. Ct. 1345, 1348 (2013) (citing 28 U.S.C. §§ 1332(d)(2) & (d)(5)(B)); *see also* SAC ¶ 43.

a preponderance of evidence that this case meets every element of the multi-pronged and narrow

local controversy exception.[10]  Specifically, Defendants offer no proof that this case meets the

following two prongs of this limited CAFA exception:

> (i) <u>The "Principle Injuries" Prong</u>: that the principal injuries from Defendants' conduct as alleged in the Complaint are limited to New York. 28 U.S.C. § 1332(d)(4)(A)(i)(III); and

> (ii) <u>The "Significant Defendant" Prong</u>: that the only New York Defendant sued, Ambit New York, is a significant defendant whose conduct forms a significant basis for the action and from whom significant relief is sought, 28 U.S.C. § 1332(d)(4)(A)(i)(II)(aa)-(bb);

Second, ignoring that this is precisely the type of case with interstate effects that

Congress required to be heard exclusively in federal court, Defendants gloss over CAFA's

legislative history which repeatedly emphasizes the sweeping scope of the 2005 law.[11]

---

[10]  While the Second Circuit has not ruled on the level of proof required to establish CAFA's exceptions, the majority of federal courts (including the two in this circuit that have considered the issue) apply a preponderance of the evidence standard.  *Hart*, 2014 WL 301357, at *5; *Richins v. Hofstra Univ.*, 908 F. Supp. 2d 358, 362 (E.D.N.Y. 2012).  *See also, In re Sprint Nextel Corp.*, 593 F.3d 669, 673 (7th Cir. 2010) (CAFA exceptions must be proven by preponderance of evidence); *Preston v. Tenet Healthsystem Mem'l Med. Ctr. Inc.*, 485 F.3d 793, 797 (5th Cir. 2007) (same); *Froud v. Anadarko E&P Co. Ltd. P'ship.*, No. 09 Civ. 00936 (WRW), 2010 WL 961456, at *2 (E.D. Ark. Mar. 16, 2010) (same); *Lancaster v. Daymar Colls. Grp., LLC*, No. 11 Civ. 157 (TBR), 2011 WL 2437774, at *3 (W.D. Ky. Mar. 14, 2012) (same); *DeHart v. BP Am., Inc.*, No. 09 Civ. 0626 (CMH), 2010 WL 231744, at *10 (W.D. La. Jan. 14, 2010) (same); *Anthony v. Small Tube Mfg. Corp.*, 535 F. Supp. 2d 506, 515 (E.D. Pa. 2007) (same).

[11]  CAFA's primary purpose is to "restore the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate cases of national importance under diversity jurisdiction."  Pub. L. 109-2, § 2, 119 Stat. 4, 5 (2005).  "There is no question that CAFA, legislation ten years in the making, is sweeping in scope."  *New Jersey Carpenters Vacation Fund v. HarborView Mortgage Loan Trust 2006-4*, 581 F. Supp. 2d 581, 584 (S.D.N.Y. 2008).  "[T]he overall intent of [CAFA] is to strongly favor the exercise of federal diversity jurisdiction over class actions with interstate ramifications."  S. Rep. 109-14, 35 (Feb. 28, 2005).  CAFA's chief sponsor in the House echoed this sentiment, eliminating all doubt as to how federal courts should apply CAFA (*see* Rep. Goodlatte, 151 Cong. Rec. H723–01, H730 (Feb. 17, 2005)):

> The bottom line is that new section 1332(d) is intended to substantially expand Federal court jurisdiction over class actions, not to create loopholes.  This provision should be read broadly, with a strong preference that interstate class actions should be heard in a Federal court. . . .

Third, Defendants ignore the most basic proposition of CAFA jurisdiction: that all doubts should be resolved in favor of maintaining federal jurisdiction. *Opelousas General Hosp. Authority v. FairPay Solutions, Inc.*, 655 F.3d 358. 360 (5th Cir. 2011); *Brook v. UnitedHealth Group Inc.*, No. 06 Civ. 12954 (GBD), 2007 WL 2827808, at *4 (S.D.N.Y. Sept. 27, 2007) ("CAFA's language favors federal jurisdiction over class actions and CAFA's legislative history suggests that Congress intended the local controversy exception to be a narrow one, with all doubts resolved in favor of exercising jurisdiction over the case.") (citations omitted).[12]

While the particulars of Defendants' failure to satisfy the local controversy exception are detailed below, at bottom this class action belongs in federal court because it involves exactly the type of interstate conduct CAFA was meant to encompass: Plaintiffs challenge the marketing and billing practices of a Texas-based energy company that is overcharging residential gas and electricity consumers across the country. SAC ¶¶ 39-41. Byzantine corporate structures notwithstanding, this is a case with national, not just local ramifications.

A.     **Defendants Have Not Met Their Burden to Show That the Principal Injuries From Defendants' Conduct Are Confined to New York. Instead, Defendants' Alleged Wrongful Conduct Is Nationwide.**

Defendants fail to satisfy the local controversy exception's "principal injuries" prong. 28 U.S.C. § 1332(d)(4)(A)(i)(III). Indeed, the case Defendants most heavily rely on to support their motion, *Mattera v. Clear Channel Commc'ns, Inc.*, 239 F.R.D. 70, 80 (S.D.N.Y. 2006), makes

---

[12] The Senate Judiciary Committee's Report on the local controversy exception further underscores this point, emphasizing (S. Rep. 109-14 at 39):

> [T]his is a narrow exception that was carefully drafted to ensure that it does not become a jurisdictional loophole. Thus, the Committee wishes to stress that in assessing whether each of these criteria is satisfied by a particular case, a federal court should bear in mind that the purpose of each of these criteria is to identify a truly local controversy – a controversy that uniquely affects a particular locality to the exclusion of all others.

clear that "[f]or the local controversy exception to apply the principal injuries suffered by the class *must* be limited to a particular state; *it does not apply to cases in which the defendants engaged in conduct that could be alleged to have injured persons throughout the country or broadly throughout several states*." (emphasis added).  The Judiciary Committee's Report on the principle injuries prong concurs:

> The purpose of this criterion is to ensure that [the local controversy] exception is used only where the impact of the misconduct alleged by the purported class is localized.  For example, a class action in which local residents seek compensation for property damage resulting from a chemical leak at a manufacturing plant in that community would fit this criterion, provided that the property damage was limited to residents in the vicinity of the plant.  However, if the defendants engaged in conduct that could be alleged to have injured *consumers* throughout the country or broadly throughout several states, the case would not qualify for this exception, *even if it were brought only as a single-state class action.*
>
> * * *
>
> In other words, this provision looks at where the principal injuries were suffered by everyone who was affected by the alleged conduct – *not just where the proposed class members were injured.*

S. Rep. 109-14 at 40-41 (emphasis added).[13]

Accordingly, the "principal injuries" prong requires that the challenged conduct be "localized" to and not the result of a business practice with interstate ramifications.  As alleged in the Complaint, Defendants' conduct affects consumers across the country, not just New York.  SAC ¶¶ 39-41.  In finding the principal injuries prong unmet in a case where health care providers challenged the provider agreement of both an out-of-state insurance holding company and a number of its New York subs, Judge Daniels stressed that "[t]he complaint itself alleges that the adverse effects suffered, as a result of defendants' culpable conduct, was not limited to the named New York plaintiffs but also included health care providers in several other states."

---

[13] *See also College of Dental Surgeons of Puerto Rico v. Triple S Mgmt., Inc.,* No. 09 Civ. 1209 (JAF), 2011 WL 414991, at *5 (D. Puerto Rico Feb.8, 2011) (quoting additional similar statements of legislative intent by Chairman of the House Judiciary Committee and Senate Judiciary Committee members).

*Brook*, 2007 WL 2827808, at * 4.  Likewise, Plaintiffs here allege that Defendants' conduct "has harmed consumers broadly throughout the country."  SAC ¶ 41.

Defendants' failure to provide the full 1% guaranteed savings and their automatic default policy is *not* unique to New York.  SAC ¶ 39.  In fact, the Complaint describes the contours of the "Illinois Guaranteed Savings Plan," which includes the exact *same* guarantee issued by the Individual Defendants, and the exact *same* automatic default policy that ensnared Plaintiffs. SAC ¶¶ 39-40.  Defendants even require New Yorkers and Illinoisans to call the same *Texas* telephone number to avoid the automatic default.  SAC ¶ 40.  In fact, Defendants memorialized the Illinois automatic default policy on the *same day* as the New York policy.  SAC ¶ 40; *see also* Wittels Decl. Exhs. 2-3, January 31, 2012 Terms of Service for Illinois and New York.

Various disclosures on the Ambit website further support Plaintiffs' allegations that the conduct of this Texas-based web of companies harms consumers in multiple states.  For example, "Ambit's" February 4, 2014 "Current Energy News" entry states "[w]e are currently offering Guaranteed Savings Plans in Delaware, Illinois, Maryland, New Jersey, New York, Pennsylvania, and Washington D.C."[14]  The terms of each of these seven Guaranteed Savings Plans spell out the exact same guarantee (1%) and the exact same automatic default policy at issue here.  *See* Terms of Service ("TOS") for all seven states annexed as Exhs. 4-10 to the Wittels Decl.[15] *See also College of Dental Surgeons*, 2011 WL 414991, at *5 (principal injuries

---

[14] Ambit, *available at*: http://ww2.ambitenergy.com/spark/guaranteed-savings-promises-to-deliver-for-customers (last visited Feb. 14, 2014).

[15] The Court should take judicial notice of Ambit's website and the terms of its various Guaranteed Savings Plans because district courts have broad authority to consider extrinsic evidence in order to determine their own jurisdiction.  *LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999) ("[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits."); *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003); *Valentín v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001).

not isolated when billing practices are common to defendants' dealings throughout United States).[16]  Defendants' implementation of the same Guaranteed Savings Plan policies in numerous states across the country plainly show the interstate implications of the practices Plaintiffs challenge here.  The source of Plaintiffs' harm is not a "localized" only to New Yorkers.  It is national.[17]

Despite the Complaint's allegations showing Defendants' interstate conduct, and sound precedent holding that the principal injuries requirement cannot be satisfied when the challenged conduct crosses state lines, Defendants offer no evidence to the contrary.  Instead, Defendants furnish dicta from *Mattera* in support of their oft-rejected argument that in order for conduct to have interstate implications, out-of state residents must have standing to raise claims under the local state's law.  Defs.' Br. 15.  Defendants' argument, however, is out of synch with the extensive federal case law that specifically holds that interstate conduct is not localized simply because it is challenged under only one state's laws.  *See, e.g.*, *Villalpando v. Exel Direct Inc.*, No. 12 Civ. 04137, 2012 WL 5464620, *12 (N.D. Cal. Nov. 8, 2012) ("There is nothing unique to California about the claims asserted in this action, even if the class is limited to Plaintiffs who provide delivery services in California and the claims in the action are based on California law. Rather, Defendants are vulnerable to similar claims in other states . . . .").[18]

---

[16] The multi-state nature of Defendants' conduct is further illustrated by the fact that all of the Ambit subsidiaries listed on the TOSs are wholly owned by Ambit Energy Holdings – and Ambit New York is just one of the subsidiaries in seven states that is part of the same conduct orchestrated from Defendants' Dallas headquarters.

[17] Indeed, if Defendants' business were so New York-centric, then certainly the current NY TOS would not contain a (patently unenforceable) venue clause purporting to require that all lawsuits against Ambit New York be filed in Texas.  Wittels Decl. Ex. 10, p.4.

[18] *See also Waller v. Hewlett-Packard Co.*, No. 11 Civ. 0454 (LAB), 2011 WL 8601207, *4 (S.D. Cal. May 10, 2011) ("[The] action is local only in the trivial and almost tautological sense that the definition

*Footnote continued on next page.*

Moreover, *Mattera* itself did not rely on standing to find that the conduct complained of was localized. Instead, the *Mattera* court found (consistent with CAFA) that the company's conduct did not have interstate implications because the challenged policy was not employed nationwide, but rather was left to the discretion of each local affiliate. 239 F.R.D. at 80.[19] In short, the *Mattera* plaintiff challenged only a *local* policy. *Id.* Unlike the *Mattera* defendants, Defendants here offer no evidence that the conduct Plaintiffs challenge occurred only in New York.[20] This case should stay in federal court.

### B. Defendants Have Not Met Their Burden to Show That Ambit New York Is a "Significant Defendant." Instead, the Evidence Shows That the Texas Defendants Are Responsible for Plaintiffs' Injuries and Are the Only Defendants Capable of Providing Plaintiffs with a Full Recovery.

Under the "significant defendant" prong, a "significant" defendant is one "from whom 'significant relief' is sought, and whose conduct 'forms a significant basis for the claims asserted' by the proposed plaintiff class." *Ava Acupuncture P.C. v. State Farm Mut. Auto. Ins. Co.*, 592 F. Supp. 2d 522, 528 (S.D.N.Y. 2008) (quoting 28 U.S.C. § 1332(d)(4)(A)(i)(II)(aa),

---

of the putative class and the legal bases of the asserted claims make it so. Courts have routinely looked beyond these formalities to the nature and scope of the alleged wrong – and rejected a [party's] invocation of the local controversy exception that relies on them."); *Kearns v. Ford Motor Co.*, No. 05 Civ. 5644 (GAF), 2005 WL 3967998, *12 (C.D. Cal. Nov. 18, 2005) (rejecting assertion that the interstate nature of the conduct was not dispositive because the proposed class was composed only of Californians who suffered harm in that state made actionable only under California consumer protection laws). *Accord*, *College of Dental Surgeons*, 2011 WL 414991, *5 ("It seems unlikely that, in an attempt to remove to federal court a larger number of class action suits that are of 'national importance,' Congress would create a loophole encouraging attorneys to maintain multiple smaller class actions in state courts.").

[19] The *Mattera* court was careful to note that the alleged "mastermind" of the challenged wage policy had no responsibility outside of New York City, that the policy was not implemented throughout New York, and that the out-of-state defendant did not maintain the policy in its New York facilities. *Id.* at 76.

[20] Even if *Mattera* did stand for the proposition that non-New York residents must be able to challenge Ambit's New York policies (which it doesn't), the evidence of potential New York class member residences that Ambit put in the record confirms that more than 2,800 residents of the class are non-New Yorkers from 40 states plus the District of Columbia, and *do* have standing to challenge Defendants' conduct under New York law. *See* Exhibit 1-9 to Declaration of Patricia Zacharie, ECF No. 59-9 pp. 1265-1319 (listing non-New York mailing addresses for Ambit New York, LLC "customers").

(bb)). Courts in this district "generally require that the local defendant's conduct must be significant in relation to the conduct alleged against the other defendants in the complaint, and that 'the relief sought against that defendant is a significant portion of the entire relief sought by the class.'" *Id.*[21] (quoting *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1167 (11th Cir. 2006); *see also Mattera*, 239 F.R.D. at 80 (party that institutes the challenged wage deduction (conduct) and retains those wages (relief) is a significant defendant). Here, Defendants fail to show that Ambit New York is "significant" in terms of either conduct or relief.

    1.  <u>Ambit New York's Conduct Is Not a Significant Basis for This Action</u>

    Ambit New York is a minor player in Defendants' wide-spread bait and switch. Another hypothetical from the Senate Judiciary Committee's Report illustrates this fact particularly well:

> A class action is brought in Florida against an out-of-state automobile manufacturer and a few in-state dealers, alleging that a certain vehicle model is unsafe because of an allegedly defective transmission. The vehicle model was sold in all fifty states but the class action is only brought on behalf of Floridians. This case would not fall within the Local Controversy Exception for two reasons. First, the automobile dealers are not defendants whose alleged conduct forms a significant basis of the claims or from whom significant relief is sought by the class. Even if the plaintiffs are truly seeking relief from the dealers, that relief is just *small change* compared to what they are seeking from the manufacturer. Moreover, the main allegation is that the vehicles were defective. In product liability cases, the conduct of a retailer such as an automobile dealer does not form a significant basis for the claims of the class members. [Second, the principal injuries from selling the defective product were not isolated to one state even though this particular action was brought as a single-state class action.]

S. Rep. No. 109-14, at 29 (emphasis added).

    Here, the Texas Defendants' conduct is just as dominant as the Senate's hypothetical manufacturer, and it is their actions (not Ambit New York's) which (1) deprive customers of their full 1% savings; (2) unreasonably withhold the required refund checks; and (3) implement a

---

[21] The Second Circuit has not determined what constitutes "significant" relief or "significant" conduct.

policy that automatically defaults customers enrolled in the Guaranteed Savings Plan into the more costly Variable Plan. SAC ¶¶ 114, 122. These are the three main allegations in the Complaint, and everything in Plaintiffs' pleading shows that the primary actors are Texas citizens that operate out of the same downtown Dallas office and that the *main* actor is the Texas holding company, Ambit Energy Holdings. SAC ¶¶ 18, 21, 31. Ambit New York is simply the deregulated energy market's version of the Senate's car dealer.

Turning to the three main allegations, the Complaint meticulously describes the publically-available information identifying the key Texas actors involved in the marketing, billing, and "savings" calculation aspects of the illusory Guaranteed Savings Plan. The Guarantee is signed by the Texans Thompson and Chambless. SAC ¶ 5. And the Plan is marketed by Sales Consultants for Texas-based Defendant Ambit Marketing. SAC ¶¶ 26-27, 30. Ambit New York was not involved in marketing the Plan because it has no New York offices, no New York staff, and no involvement in the design or furnishing of Ambit's marketing materials. SAC ¶ 29. The local defendant also plays no part in enrolling consumers into the Plan: enrollment can only be done through the Texas holding company's website or by a Sales Consultant working for Ambit Marketing LLC. SAC ¶ 30. Further, Ambit New York did not bill Plaintiffs for their electricity. SAC ¶ 32. Plaintiff Simmons' electricity bills list her electricity supplier as a Texas company, "AMBIT ENERGY" with a Dallas address and Texas phone number. SAC ¶¶ 18, 32, 34.

Ambit New York also is not responsible for the improper conduct that deprives consumers of the promised savings: misrepresenting the amount the customers' incumbent utilities would have charged. SAC ¶ 35. The savings calculations are performed by Ambit Energy Holdings. SAC ¶ 35. The annual "savings letter" that displays the misleading

calculations is also from the holding company, not Ambit New York. SAC ¶ 36. Finally, the refund payments are provided by the Texas holding company, not the local defendant. SAC ¶ 36.

The Complaint similarly alleges that the conduct giving rise to Plaintiffs' second main allegation – that the refund checks are withheld for years – also occurred in Texas. SAC ¶ 35. Finally, concerning Plaintiffs' third principal allegation, Ambit New York did not design or implement the automatic default policy. SAC ¶ 37. Ambit New York does not monitor compliance with the policy or make the determination that a consumer should be defaulted. SAC ¶ 37. Customers only avoid this fate by contacting the holding company through its website or calling or faxing the required information to the company's Plano, Texas call center. SAC ¶ 37.

The law is clear: merely suing Ambit New York does not alter its bit-part role among the leading Texas-based actors. "In other words, the mere fact that relief might be sought against [the local defendant] for the conduct of others (via joint liability) does not convert the conduct of others into conduct of [the local defendant] so as to also satisfy the 'significant basis' requirement." *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1167, n.7 (11th Cir. 2006).[22]

Even assuming Ambit New York participated in amending the TOS (a fact which Defendants provide no evidence to support), such conduct is insufficient to satisfy the significant

_____

[22] The only allegation in the Complaint directed at Ambit New York's conduct is that that it may have assisted the Texas Defendants in amending the Terms of Service ("TOS") to memorialize the automatic default policy. SAC ¶¶ 98, 105. Of Plaintiffs' five causes of action, the local defendant is only named in the two statutory counts related to the TOS amendment. SAC, Count I, II. Count I alleges that Ambit Energy Holdings and the two individual defendants unilaterally amended the TOS in violation of G.B.L. §349-d(6)'s mandate that material changes to energy contracts be made with the consumer's express consent. SAC ¶¶ 96-98. Similarly, Count II alleges that Ambit Energy Holdings and the two individual defendants violated G.B.L. §349-d(7)'s disclosure obligations by inadequately disclosing the terms of the automatic default procedure in the TOS. As alleged in both counts, however, Ambit New York's conduct (if any) was minimal, and only in support of the Texas Defendants. SAC ¶¶ 98, 105.

conduct test.[23]  *See Ava Acupuncture*, 592 F. Supp. 2d at 531-32 (holding "significant conduct"

requirement not satisfied when allegations of the out-of-state defendant's wrongdoing detail

broader and more widely repeated conduct); *Kearns*, 2005 WL 3967998 at **2, 11 (relying on

hypothetical from Judiciary Committee Report, court found no significant conduct by local

dealers, notwithstanding their responsibility for selecting vehicles for marketing program,

handling applications and billing, and conducting allegedly fraudulent inspections, holding:

> [The local car dealer's] involvement is no different from that of the imagined
> insurance agent in the Committee Report, who presumably markets the program
> to clients, accepts and processes their applications, and handles billing.  It is [the
> national operating company] Ford, like the insurance company, that promulgates
> and oversees the overall alleged fraud.  As such, if the Committee Report
> discounts the insurance agents' conduct as not forming a "significant basis" for
> the claims of the class members, the definition of that term must similarly exclude
> the conduct of [the local car dealer] and other dealers.

In an attempt to beef up Ambit New York's role in the case, Defendants mischaracterize

the Complaint, suggesting that Ambit New York's conduct is central, and that Plaintiffs allege

violations of the law equally against all Defendants.  Defs.' Br.  10-12.  Not true.  The Complaint

contains numerous factually supported allegations showing that (at best) Ambit New York's

---

[23] Indeed, Plaintiff Kalatizadeh's experience as an Ambit customer reveals that Defendants began
defaulting customers onto the Variable Plan before the TOS was amended to memorialize the new opt-in
procedure.  SAC ¶ 8, 75.  Defendants offer no evidence to rebut this allegation.  Moreover, Defendants
fail to offer any evidence to counter Plaintiff Simmons' allegation that because Defendants failed to
properly follow the amendment procedures in the TOS, Ambit New York was not properly added to the
TOS and is thus not a party to the TOS applicable to Plaintiff Simmons and the class members who
switched to Ambit prior to 2010.  SAC ¶ 38.  Finally, Defendants' repeated attempts to hide behind the
fact that Ambit New York is listed on the TOS rings hollow.  The TOS is not a valid contract.  N.Y. Gen
Bus. Law 349-d(8) ("Any contract for energy services which does not comply with the applicable
provisions of this section shall be void and unenforceable as contrary to public policy.").

conduct is minor. *See* SAC ¶¶ 29-38, 98, 105.[24]  Moreover, the local defendant is only named in two of Plaintiffs' five causes of action.[25]

Also untrue is Defendants' statement that "Plaintiffs admit they contracted directly with Ambit New York." Defs.' Br. 13.  Plaintiff Simmons did not contract with Ambit New York, because Ambit Energy, L.P. failed to properly follow the TOS's amendment procedures.  SAC ¶ 38.  *See also* Wittels Decl. Ex. 11, 2008 TOS ¶ 21, applicable when Ms. Simmons became a customer in 2008 (requiring Ambit Energy, L.P. to provide 30 days' notice prior to amendment).

Further, while Ambit New York is the counter party to Plaintiff Kalatizadeh's TOS and is potentially liable for the Complaint's two statutory violations predicated on the January 31, 2012 TOS, those two facts alone don't overshadow the other facts central to the significant basis analysis.  First, the TOS is not a valid contract.[26]  Second, the statutory counts are only two of the Complaint's five counts.[27]  Third, Defendants emphasis on the question of whether Ambit New York is

---

[24] Also contrary to Defendants' contentions, the Complaint's allegations of fact (which Defendants do not even contest) are not "legally conclusive." Defs.' Br. 15.  There is nothing conclusory about averments that Ambit New York has (1) no local offices or staff, (2) does not market energy plans, (3) does not enroll customers, (4) did not bill Plaintiffs for their energy, (5) does not have Plaintiffs' money, (6) has no New York call center, (7) does not mail the savings letter or issue the refunds, and (8) did not design or implement the automatic default policy.  SAC ¶¶ 29-38.

[25] Defendants are simply in error when later in their brief they contend (inconsistently) that all of Plaintiffs Section 349-d claims target Ambit New York.  Defs.' Br. 16.  Ambit New York is only named in Counts I and II.  *See* SAC, Counts I to V.  Further, Defendants' snippets from the Complaint's class action allegations (Defs.' Br. 12) don't undercut Plaintiffs' conduct-specific allegations.  The class allegations set forth the common questions arising from the uniform practices Plaintiffs challenge, but don't speak to which Defendant engaged in these practices. *Compare with* ¶¶ 29-38, 98, and 105 of the Complaint – all of which address conduct and show that Ambit New York is not a significant defendant.

[26] §349-d(8) ("Any contract for energy services which does not comply with the applicable provisions of this section shall be void and unenforceable as contrary to public policy.").

[27] Thus even if Ambit New York was the prime target of those counts, that is only 2/5th of the Complaint.

potentially liable is simply smoke from another fire.[28]  Fourth, the Texas Defendants are alleged to

be the primary actors in drafting the 2012 TOS challenged in the statutory counts, not Ambit

New York, and Defendants offer no evidence countering these allegations.  SAC ¶¶ 96-98, 105.[29]

Defendants' case law and other authority on significant conduct support Plaintiffs'

arguments or are readily distinguished (Defs.' Br. 11-12, 14, 16-17):

- *Mattera*: Unlike Ambit New York, the local defendant implemented the challenged policy and kept the money from the allegedly unlawful conduct.  239 F.R.D. at 80.  Here, Defendants offer no evidence (1) that Ambit New York took any acts relevant to Plaintiffs' three main allegations, or (2) that Ambit New York has Plaintiffs' money.  Defendants could have put such evidence in the record, but they didn't.  This omission is revealing, and dispositive. [30]

[28] Such a contention "conflates the requirement that the local defendant's conduct form a significant basis of the claims with the requirement that the local defendant be one from whom significant relief is sought." *Opelousas*, 655 F.3d at 363 (rejecting argument that local defendant's conduct was significant because it was sued under statute that imposes solidary liability).

[29] Even if Ambit New York played a role in drafting the TOS, its role was subsidiary, in reliance on the Texas Defendants' conduct, and thus insignificant.  *See Opelousas*, where the Fifth Circuit held that the plaintiff failed to meet the local-controversy exception's requirements, because the claims against the local defendant rested on the allegation that the local defendant relied on the non-local defendant's calculations.  655 F.3d at 363.  This is because privity is not the focus, conduct is.

[30] The *Mattera* court also never "looked beyond" the plaintiff's contention that she was not employed by the local defendant to determine that in fact she was the in-state defendant's employee.  Defs.' Br. 11, 16.  The *Mattera* court never decided the "highly disputed" question of whether or not the named plaintiff was employed by the local defendant, because it was undisputed that the local defendant employed "a significant number" of the other class members.  239 F.R.D. at 75-76.  As such, the plaintiff's evidence that she was employed by the out-of-state defendant was irrelevant to the court's indispensable party analysis – which is an inquiry that is irrelevant to our significant conduct question.  *Id.*  Moreover, Defendants' repeated emphasis on the fact that the local defendant in *Mattera* was not even named in the plaintiff's complaint also misses the mark.  Defs.' Br. 12, 16.  The *Mattera* court's holding contains no indicia that it was a responding to any perceived gamesmanship on the plaintiff's part.  And there was nothing to suggest that the plaintiff did not have a good faith basis for her jurisdictional claims.  Accordingly, Defendants' use of *Mattera* to supplement their *ad hominem* arguments should be disregarded.  This case also bears no resemblance to *Lucker v. Bayside Cemetery*, where the plaintiffs were found to have equivocated on their own citizenship: they were either New York citizens or they were not.  262 F.R.D. 185, 189 (E.D.N.Y. 2009).  The significant defendant inquiry, however, is not a black or white proposition, it involves questions of degree.  Who is more significant?  Is the relief sought significant compared to the other relief sought? Accordingly, there is nothing "clever" or inconsistent about naming a company as a defendant and then pleading the pertinent jurisdictional facts to show that federal jurisdiction is present.  Defendants' attack is off base.

- *Coleman v. Estes Exp. Lines, Inc.*, 631 F.3d 1010, 1013, 1020 (9th Cir. 2011): failure to distinguish between exact same actions of local and foreign defendants triggered significant basis exception.[31]

- Energy Services Company Consumers Bill of Rights. This statute does not govern only the conduct of registered ESCOS. Defs.' Br. 13. It covers all "persons" engaging in deceptive conduct on behalf of an ESCO. § 349-d(3).

Accordingly, the local controversy exception does not apply because Defendants have failed to show Ambit New York's conduct forms a significant basis for Plaintiffs' claims.

2. Plaintiffs Do Not Seek Significant Relief from Ambit New York

Although CAFA does not define "significant relief," courts in this district require that to fit the exception a party must demonstrate that "the relief sought against that defendant is a significant *portion* of the entire relief sought by the class." *Ava Acupuncture*, 592 F. Supp. 2d at 528 (emphasis added); *see also Mattera*, 239 F.R.D. at 80 (significant relief sought when local defendant retained a significant portion of the total relief claimed by plaintiff). Courts also consider each defendant's ability to satisfy a potential class judgment. *See, e.g.*, *Evans*, 449 F.3d at 1167, n.7; *Casey v. Int'l Paper Co*, 2008 WL 8854569, at *5 (N.D. Fla. Jan. 7, 2008).[32]

---

[31] *Coleman* also holds that a court's inquiry on the significant defendant tests should not consider extrinsic evidence and be limited solely to the complaint, which would sink Defendants' significant defendant arguments entirely. 631 F.3d 1019. No court in the Second Circuit, however, has considered this issue and in light of Plaintiffs' request for jurisdictional discovery, the doctrine of judicial estoppel would bar Plaintiffs from advocating that this portion of *Coleman* should be adopted here. *Opelousas*, 655 F.3d at 361 (5th Cir. 2011) (refusing to apply *Coleman* after party requested discovery to establish the local controversy exception).

[32] This is because "[a]s a practical matter, considering that class actions falling under CAFA involve $5,000,000 or more in damages, the plaintiffs in any CAFA case will necessarily seek the most 'significant relief' from the defendants capable of paying that amount, typically corporate defendants with deep pockets, not mere employees or other entities." *Casey* 2008 WL 8854569, at *5; s*ee also Robinson v. Cheetah Transp.*, No. 06 Civ. 0005, 2006 WL 468820, at *4 (W. D. La. Feb.27, 2006) (although individual defendant's negligence substantially contributed to damages being claimed, "it does not follow that the class members seek significant relief from him. . . . plaintiffs will seek most of that relief [at least $5M] from those who are capable of paying it: the corporate defendants.").

Here, Defendants have offered no proof that Ambit New York is capable of satisfying any judgment against it, let alone Defendants' hypothetical $100 Million judgment. Defs.' Br. 14. The only Defendant from whom Plaintiffs seek significant relief is Ambit Energy Holdings. SAC ¶ 21. Given Ambit New York's lack of involvement in the marketing, billing, servicing, and refunding of customers' accounts (SAC ¶¶ 29, 34, 36), it is more than plausible to infer that Ambit New York has no assets to satisfy any judgment. If it did, Defendants could (and would) have put that evidence in the record. Further, assuming *arguendo* Ambit New York could satisfy a judgment against it, that amount pales in comparison to the relief sought from the holding company: Counts III, and IV and V (where Ambit New York is *not* named) which encompass all customers in the Guaranteed Savings Plan provide substantially higher damages as compared to the two counts against Ambit New York (I and II) for one-time disclosure violations.[33]

Finally, Defendants' assertion that injunctive relief is in and of itself "significant" ignores both the significant relief test (which looks at the "portion" of the entire relief sought), as well as the Ninth Circuit's decision in *Coleman*. Defs.'s Br. 10. Here, the only injunctive relief that could potentially affect Ambit New York relates to reforming the TOS, a single document. *See* SAC, Counts I, II. If Plaintiffs injunctive claims are successful, the TOSs terms setting forth the particulars of the Variable Plan will have to be amended. SAC, Count II. Even assuming that task fell to Ambit New York as opposed to another Defendant, amending the TOS is not "significant."[34] Moreover, unlike the facts in *Coleman* showing heavy involvement by the local

---

[33] Defendants thus dissemble by contending that the Complaint "seeks equal" damages against "all Defendants. " Defs.' Br. 12. Also untrue is Defendants' contention that the Section 349 allegations "apply to Ambit New York." Defs.' Br. 14, n.10.

[34] While it could also be argued that an injunction under Count I requires Defendants to enact policies assuring that consumers provide their express consent prior to being switched to the Variable Plan, this

*Footnote continued on next page.*

defendant as well as significant assets (631 F. 3d. at 1012), Plaintiffs' Complaint underscores Ambit New York' negligible role and lack of a true corporate independence (*i.e.*, no New York office, staff, marketing employees, or call center). *See* SAC ¶¶ 18, 29-38, 98, 105.

## III.  DEFENDANTS' MERE DEPARTMENT AND VEIL PIERCING ARGUMENTS ARE OFF BASE AND SHOULD BE DISREGARDED – THE LAW ALLOWS PLAINTIFF TO SUE THE TEXAS DEFENDANTS DIRECTLY

Plaintiffs' Complaint alleges that Ambit New York is the Texas holding company's "mere department" in New York, which allegations respond to the holding company's now renounced objection to personal jurisdiction. SAC ¶¶ 29, 50.[35] Notwithstanding the change of heart, Defendants now contend that the Complaint's mere department allegations are "legally irrelevant to the subject matter jurisdiction analysis under CAFA exceptions." Defs.' Br 17. This is incorrect. The facts that are relevant to both personal and CAFA jurisdiction cannot be ignored simply because the holding company has submitted to jurisdiction. The pertinent facts, *i.e.*, the fact that Ambit New York has no New York office or staff, and does no marketing, which relate to both personal jurisdiction and CAFA, are not diminished. SAC ¶ 29.

Defendants' veil-piercing arguments also fall far short of the mark. Ambit Energy Holdings, Jere Thompson, and Chris Chambless are named as the primary defendants in the two Counts that name Ambit New York. *See* SAC Counts I and II.[36] Contrary to Defendants'

---

burden would not fall on Ambit New York, as it has no local staff (SAC ¶ 29) and any web-based consent mechanism would go on the Ambit website, which is owned by the holding company. SAC ¶ 30.

[35] Ambit Energy Holdings initially contended that it was not subject to personal jurisdiction in New York. *See* Notice of Mot. to Dismiss First Am. Class Action Compl. for Lack of Personal Jurisdiction, ECF Nos. 16, 24. As Defendants now recognize, jurisdiction over a foreign holding company can be created by a New York subsidiary. *See e.g., Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984) (establishing four part "mere department" test). Because the Complaint set forth several facts relevant to the *Beech* test (SAC ¶ 29) that demonstrated personal jurisdiction over the holding company, Defendants abandoned any challenge to personal jurisdiction. *See* Defs.' Br. 2-4.

[36] Ambit Marketing is also named as a primary defendant in Count II.

contention, piercing the corporate veil is not needed to impose liability on these Texas Defendants for the violations identified in Counts I and II. Defs.' Br. 17-19.

First and foremost, "the individual liability of a corporate officer for her participation in unlawful conduct is distinct from any issue of piercing the corporate veil." *JTH Tax, Inc. v. Gouneh*, 721 F. Supp. 2d 132, 140 (N.D.N.Y. 2010) (internal quotation and alterations omitted).[37] Here, the Complaint clearly challenges Defendants Thompson and Chambless' actions which give rise to liability under Sections 349-d(6) and (7). SAC ¶¶ 98, 105-06.[38] Second, there is also no need for veil piercing when a parent corporation is directly liable for its own misconduct.[39] Finally, Ambit Energy Holdings can be held liable for Ambit New York's statutory violations under general agency principles.[40] Agency is present here even without discovery, as the TOS is overflowing with indicia of the holding company's intent to be bound. The TOS explicitly references the holding company, prominently features its trademarked "Ambit Energy" logo, provides its web address as the "Internet Address" for "Ambit Energy," directs all customer service-related

---

[37] This is because "[t]he corporate veil" protects *shareholders* from liability for *corporate* transgressions, but does not shield corporate *employees* from their own wrongdoing. *Morin v. Trupin*, 747 F. Supp. 1051, 1068 (S.D.N.Y. 1990) (emphasis in original); s*ee also City of New York v. Smart Apartments LLC*, 959 N.Y.S.2d 890, 895 (Sup. Ct. 2013) ("Corporations can only act through their employees; but that does not mean that any act done in furtherance of the corporation's business is shielded by the corporate veil, which limits personal financial liability for a corporation's financial debts. For example, an employee who dumps a corporation's toxic waste is still liable for violating anti-pollution laws.").

[38] Defendants also do not even attempt to explain why Plaintiffs would need to pierce Ambit New York's corporate veil in order to pursue claims under 349-d(7) against Ambit Marketing and Chris Chambless for the unlawful marketing material these Defendants produced. *See* Count II. Ambit New York produced no marketing material. SAC ¶ 29.

[39] *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 417 (S.D.N.Y. 2011) ("The Parent Companies could be liable directly *or* as alter egos of entities they own or control.") (emphasis added). Plaintiffs have alleged the former: Ambit Energy Holdings committed the violations in its own right. SAC ¶¶ 98, 105-06.

[40] This is because "a parent corporation may become a party to its subsidiary's contract under an agency theory if the parent's conduct manifests an intent to be bound by the contract." *Noresin AB v. ICC Indus., Inc.,* No. 91 Civ. 1748 (MBM), 1991 WL 161367, at *1 (S.D.N.Y. Aug. 16, 1991).

inquiries to the holding company's Texas call center, unsuccessfully fixes venue in Texas, and

prodigiously uses the holding company's trademarked term "Ambit Energy." SAC, Ex. 7.[41]  In

sum, the Texas Defendants are liable to Plaintiffs and the Class without veil piercing.

## IV.    THE COMPLAINT STATES VALID CLAIMS FOR RELIEF UNDER NEW YORK'S CONSUMER PROTECTION LAWS

### A.    Legal Standard

"The function of a motion to dismiss is merely to assess the legal feasibility of the

complaint, not to assay the weight of the evidence which might be offered in support thereof."

*Quinn v. Walgreen Co.*, – F. Supp. 2d –, No. 12 Civ. 8187, 2013 WL 4007568, at *5 (S.D.N.Y.

Aug. 7, 2013) (quoting *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748

F.2d 774, 779 (2d Cir. 1984).  In considering a motion to dismiss, all allegations in the complaint

must be taken as true and construed in the light most favorable to the Plaintiffs.  *Ashcroft v.

Iqbal*, 129 S. Ct. 1937, 1949 (2009).  A complaint need only allege sufficient facts to show "a

claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  The plausibility analysis is "context-specific," and courts are advised to draw upon

"judicial experience and common sense" in applying it.  *Iqbal*, 129 S. Ct. at 1950.  However,

assessing plausibility does not involve analysis of the merits.  *Twombly*, 550 U.S. at 556-57.

Against the backdrop of a Complaint spotlighting that Plaintiffs and the Class have (1)

been deprived of their promised 1% savings; (2) had their refund checks unreasonably withheld;

---

[41] *See also Pullman v. Alpha Media Pub., Inc.*, 12 Civ. 1924 (PAC) (SN), 2013 WL 1290409 (S.D.N.Y. Jan. 11, 2013) (parent company is a party to subsidiary's contract when parent controlled subsidiary, parent's branding is used, companies have same officers and business location, and agreements executed by parent on behalf of subsidiary).  This is especially the case since the TOS which violates both 349-d(6) and (7) is *void.  See*  349-d(8) ("Any contract for energy services which does not comply with the applicable provisions of this section shall be void and unenforceable as contrary to public policy.") Accordingly, a contract between Plaintiffs and "Ambit" is an implied-in-fact contract where Ambit Energy Holdings, the owner of the "Ambit" brand, is the only possible counterparty.

and (3) been the victim of a policy that automatically defaults customers enrolled in the Guaranteed Savings Plan into the more costly Variable Plan (SAC¶ 11) – Defendants remarkably still advance largely merits arguments for dismissal. Their motion should be denied.

### B.     The Complaint Does Not Use Group Pleading

Ironically, after dedicating several pages in its memo to argue that Ambit New York's conduct forms a significant basis for Plaintiffs' claims, Defendants change tack and contend that the Complaint's alleged use of group pleading fails to give each Defendant notice of the claims against it. Defs.' Br. 20. Defendants' argument is not convincing because the Complaint does not use the group pleading device. As previously discussed, the Complaint meticulously describes the role each Defendant played as it relates Plaintiffs' allegations. *See* pp. 14-16 *supra*. And each of the five counts specifies how each Defendant's conduct violates the law.

Yet Defendants simply ignore these allegations and instead focus on how many times the Complaint uses the word "Ambit," "Ambit Energy" or "Defendants," which completely misses the mark. Defs.' Br. 22. Once the Complaint makes clear the role of each Defendant (with the holding company as the primary actor), Rule 8 imposes no further obligation on Plaintiffs to repeat those allegations *ad nauseum*. As a case Defendants cite in their brief explicitly states, "grouping provides a convenient means of referring to separate actors who perform identical actions and are subject to an identical legal analysis." *Blanchard v. Lee*, No. 13 Civ. 220, 2013 WL 4459866, at *3 (E.D. La. Aug. 15, 2013). This is particularly true when, as set forth in the Complaint's very first paragraph, "Ambit" is how Defendants hold themselves out to the public. The Complaint easily satisfies Rule 8.[42]

---

[42] None of Defendants' cases counsel a different conclusion. In *Holmes v. Allstate Corp.*, the complaint failed to demonstrate the nature of each defendant's misconduct, likely because the *Holmes* plaintiff had

*Footnote continued on next page.*

**C.** **The Complaint More Than Adequately Pleads Violations of GBL § 349-d(6) – Count I.**

Plaintiffs' first cause of action arises under 349-d, the Energy Services Company Consumers Bill of Rights. Section 349-d was enacted to "establish[] important consumer safeguards in the marketing and offering of contracts for energy services to residential and small business customers." New York Sponsors Memorandum, 2009 A.B. 1558, at 1 (2009) attached as Wittels Decl. Exhibit 12. As the sponsoring memorandum notes, Section 349-d was enacted to sanction the exact type of deceptive conduct Plaintiffs challenge here:

> Over the past decade, New York has promoted a competitive retail model for the provision of electricity and natural gas. Consumers have been encouraged to switch service providers from traditional utilities to energy services companies. Unfortunately, consumer protection appears to have taken a back seat in this process.
>
> * * *
>
> High-pressure and misleading sales tactics, onerous contracts with unfathomable *fine print*, short-term "teaser" rates followed by *skyrocketing* variable prices – many of the problems recently seen with subprime mortgages are being repeated in energy competition. Although the [New York Public Service Commission] has recently adopted a set of guidelines, its "Uniform Business Practices" are limited and omit important consumer protections in several areas. The fact is, competition in supplying energy cannot succeed without a meaningful set of standards to weed out companies whose business model is based on taking unfair advantage of consumers.
>
> This bill would build on the approach taken by the PSC by . . . protecting customers from excessive termination fees, "bait-and-switch" contract changes and *deceptive renewal practices . . . .*

---

not ascertained the entities' role (if any) in the subject transactions. No. 11 Civ. 1543 (LTS) (DF), 2012 WL 627238, *25 (S.D.N.Y. Jan. 27, 2012). In *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, the plaintiffs failed to specify *any* differences in the conduct of the corporation and the three individual defendants. 1994 WL 88129, at *20 (S.D.N.Y. Mar. 15, 1994). That is not the case here. *See* pp. 14-16 *supra*. In *L'Esperance v. HSBC Consumer Lending, Inc.*, the plaintiff brought suit concerning multiple loans issued by one lender but inexplicably sued a number of additional banks. No. 11 Civ.555 (LM), 2012 WL 2122164, at *4 (D.N.H. June 12, 2012). The *L'Esperance* court found that, unlike here, the plaintiff did not allege specific conduct by specific defendants, but, rather, based its claims on the theory that what one defendant did, all defendants must have done.

*Id.* at 3-4 (emphasis added).

As such, Section 349-d provides broad consumer protections, including 349-d(6) which explicitly protects consumers from being bound through inaction to new or unexpected contract provisions. Section 349-d(6) states "[n]o material change shall be made in the terms or duration of any contract for the provision of energy services by an ESCO without the express consent of the customer." The language is plain, material changes require express consent. Here, Plaintiffs allege that the addition of the automatic default policy to the TOS – provisions which require customers to opt-in to the Guaranteed Savings Plan or otherwise be defaulted into the more expensive Variable Plan – was made without their express consent. SAC ¶¶ 8, 77, 96-97.

Defendants, for their part, try to wriggle their way out of liability by proffering a highly suspect and untenable alternative statutory interpretation: one that permits Defendants to make any material contract change they like, as long as the consumer is informed in writing before the material change is made. Defs.' Br. 28. In addition to eviscerating the statute's consumer protection purpose, Defendants ignore the plain meaning of the statute's text. Defendants base their argument on the second sentence in Section 349-d(6), which states "[t]his shall not restrict an ESCO from renewing a contract by clearly informing the customer in writing, not less than thirty days nor more than sixty says prior to the renewal date, of the renewal terms and of his or her option not to accept the renewal offer . . . ." But this sentence does not give an ESCO carte-blanche to make any change it desires. It only allows ESCOs to renew their contracts by providing customers with written notice, provided the renewal contract does *not* contain a material change, which per the first sentence requires express consumer consent. Defendants' interpretation of the second sentence would render the first sentence meaningless – which

27

violates "the most basic interpretive canon requiring us to interpret statutes such that no part will be inoperative or superfluous." *In re Barnet*, 737 F.3d 238, 249 (2d Cir. 2013).

The implausibility of Defendants' reading is further underscored by the Public Service Commission's (the "PSC") regulations implementing the ESCO Consumers Bill of Rights. Section 349-d(6) states that "[t]he public service commission . . . may adopt additional guidelines, practices, rules or regulations governing the renewal process." On December 17, 2010 the PSC issued the following definition of "material change":

> Regarding contract renewals, with the exception of a rate change, or an initial sales agreement that specifies that the agreement renews on a monthly basis with a variable rate methodology which was specified in the initial sales agreement, all other changes will be considered material and will require that the ESCO obtain the customer's express consent for renewal.

*In re: Retail Access Bus. Rules*, No. 98-M-1343, § 5(4)(d), Wittels Decl. Ex 13.

Neither of these two exceptions include Defendants' 2012 amendment to the TOS that memorializes the particulars of the new automatic default policy. This policy is not a simple "rate change," it is the loss of a guarantee. Nor is Defendants' amendment the renewal of a variable rate agreement that previously set forth a "variable rate methodology." There was no Variable Plan prior to the amendment. Aside from the fact that under the PSC regulations Defendants' amendment is clearly material, if Defendants reading of the statute were correct, the PSC would not need to except any changes from the definition of "material change" because all changes, material or not, would require only written notice, which, of course makes no sense given the plain meaning of 349-d(6) and its broad consumer protection purpose.[43]

---

[43] Moreover, even if Defendants' reading were correct – which it is not – Defendants' merits argument that it "informed the customer in writing of the terms under which the customer could renew the savings component of their month-to-month plan" is inappropriate on a motion to dismiss. Whether Defendants informed consumers in writing is clearly a question of fact.

**D.      Defendants Violated GBL § 349-d(7) – Count II.**

Section 349-d(7) provides that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified."  The Complaint alleges that the TOSs and "Ambit's" marketing material do not (1) clearly or (2) conspicuously identify *any* variable charges in the Variable Plan. SAC ¶¶ 79-81, 105-106.  In particular, the Complaint excerpts the 2012 TOS's short description of the Variable Plan which refers only to a "plan," lists no variable charges, and explains nothing about how the unnamed charges will affect the overall rate charged to consumers (SAC ¶ 79):

> *New York Select Variable Plans:*
> New York Select Variable for electric and New York Select Variable Natural Gas plans are competitive month-to-month variable rate plans.

That is all the disclosure consumers get, which clearly violates Section 349-d(7).  Moreover, this one-liner is deceptively inconspicuous.  SAC ¶ 81.  The reference to the Variable Plan is in the same small print as the TOS's other terms, and is buried without any highlights in the three-page form contract.  SAC ¶ 81.  No special boxes, colors, or font sizes set off Defendants' nebulous description of the Variable Plan.  SAC ¶ 81.  Further, Defendants marketing materials make no mention of the Variable Plan at all. SAC ¶ 81.[44]  These shortcomings violate both the letter and the spirit of 349-d(7), which is to allow consumers to make informed choices: "These provisions will go a long way toward restoring an orderly marketplace where consumers can make informed decisions on their choices for gas and electric service . . . ."  New York Sponsors Memo. at 4.

Notwithstanding the clear language of the statute, and the express purpose of 349-d, Defendants offer only half-hearted defenses.  First, they state that the "variable nature" of the *Guaranteed Savings Plan* is conspicuous by virtue of its title alone.  Defs.' Br. 29.  The suspect

---

[44] Defendants offer no defense to Plaintiffs' allegations concerning the marketing material.

merits of this argument aside, Plaintiffs challenge (for now) only the disclosures as they relate to the Variable Plan.  Second, Defendants offer the conclusory argument that the TOS clearly and conspicuously "defines" the fact that Variable Plan is based on variable charges.  *Id*.  The statute requires that *all* variable charges be explained, not that the Variable Plan itself be "defined."  Third, Defendants state that "in bold" the TOS "delineate[s] the service term as month-to-month."  *Id*.  Aside from the fact that the term "month-to-month" is not set forth in bold anywhere in the TOS, the length of the contract's term is irrelevant.  Section 349-d(7) addresses variable "charges."

Fourth, and after another puzzling reference to the Guaranteed Savings Plan, Defendants state that the Variable Plan is described as a "competitive month-to-month variable rate plan[]."  Ignoring for now that that this description is entirely inconspicuous, Defendants offer an interpretation of section 349-d(7) that would allow ESCOs to charge whatever rate they wished on whatever basis they chose, so long as they reductively state that their rates are "variable."  This is the antithesis of what the statute requires: a clear identification of the variable charges that make up the Variable Plan and an explanation of how they will affect the overall rate charged to consumers.  Plaintiffs' claim under 349-d(7) should not be dismissed. [45]

### E.  The Complaint Sets Forth Numerous Deceptive Practices Prohibited by Sections 349 and 349-d(3) – Counts III and IV.

New York General Business Law Section 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business . . . ."  Likewise, Section 349-d(3) requires that "[n]o

---

[45] *But see Wise v. Energy Plus Holdings*, No. 11 Civ. 7345, Tr. at 17-18 (S.D.N.Y Mar. 29, 2012) (holding that 349-d(7) is not meant to address the content of the ESCO's identification of variable charges but rather the fact that the charges are variable) attached as Wittels Decl. Ex. 14.  While Plaintiffs' allegations concerning the conspicuousness of the Variable Plan charges distinguish this case from *Wise*, Plaintiffs respectfully disagree with Judge Pauley's conclusion concerning the extent of disclosure necessary.  One of the purposes of 349-d was to combat "skyrocketing variable prices" and without a full explanation of what factors can cause those prices to rise, consumers told that their ESCO plan is simply "variable" are given no advance warning of the factors that may lead their energy prices to skyrocket.

person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services." To establish a violation under either section, plaintiffs must demonstrate that "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995)). "[D]eceptive acts" are defined as acts that are "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Maurizio*, 230 F.3d at 522. Section 349 encompasses all types of unsavory business practices, including: (1) false advertising; (2) pyramid schemes; (3) deceptive preticketing; (4) misrepresentation of the origin, nature or quality of the product; (4) false testimonials; (5) deceptive collection efforts against debtors; (6) deceptive practices of insurance companies; and (7) "bait and switch" sales tactics. *See Teller v. Bill Hayes, Ltd.*, 213 A.D.2d 141, 146 (2d Dep't 1995) (collecting cases).

In ruling on a motion to dismiss Section 349 claims, courts should consider four important aspects of this law. First, Section 349 claims are not subject to Rule 9(b)'s heightened pleading requirements. *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005). Second, to state a Section 349 claim, plaintiffs need not allege reliance on defendants' misrepresentations. *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y. 3d 940, 941, 944 (2012). Third, plaintiffs need not plead defendants knew or should have known the statements were false or misleading. *Oswego Laborers'*, 85 N.Y.2d at 26. Finally, "whether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires consideration and weighing of evidence from both sides and therefore usually cannot be resolved through a motion to dismiss." *Ackerman v. Coca–Cola Co.*, No. 09 Civ. 0395, 2010 WL 2925955, at *17 (E.D.N.Y. July 21,

2010) (internal quotation marks omitted); *see also Quinn v. Walgreen Co.*,– F. Supp. 2d –, No. 12 Civ. 8187, 2013 WL 4007568, at *8 (S.D.N.Y. Aug. 7, 2013) (same, quoting *Ackerman*); S*ims v. First Consumers Nat. Bank*, 303 A.D.2d 288, 289 (1st Dep't 2003) (same).

Considering these factors, Plaintiffs have easily stated a valid Section 349 claim. In fact, the Complaint outlines *seven* discrete deceptive acts. SAC ¶¶ 114, 122. Defendants, however, only take issue with five. Defs.' Br. 24-28. This alone requires denial of Defendants' motion to dismiss Plaintiffs' 349 and 349-d claims. Especially since Defendants ignore the Complaint's primary allegation: that the 1% Savings Guarantee is false. SAC ¶¶ 4, 65-67, 114, 122.

As the Complaint painstakingly details, while "Ambit" promises customers savings of at least 1% over what their existing utility would have charged, Defendants deny customers this guarantee by overstating the amount the customers incumbent providers would have charged during the year. SAC ¶¶ 4, 65-67,114, 122. While Defendants have correctly chosen not to challenge these allegations, their attacks on Plaintiffs' remaining allegations are ill conceived.

First, Defendants argue that their policy of automatically defaulting customers enrolled in the Guaranteed Savings Plan into the more expensive New York Select Variable Plan was fully disclosed. Defs.' Br. 25-26. Putting aside that this merits argument assumes the adequacy of Defendants' delivery of their updated TOS (which Defendants conveniently fail to describe), fine print disclosures of a brand new policy likely never delivered to current customers cannot undo the drumbeat of years of marketing the 1% Savings "Guarantee." *Ackerman*, 2010 WL 2925955, at *16 ("The fact that the actual sugar content of vitaminwater was accurately stated in an FDA-mandated label on the product does not eliminate the possibility that reasonable consumers may

be misled [about sugar content].") [46]  As the Complaint makes clear, Defendants offer consumers "the peace of mind of knowing that [they] will save at least 1% annually."  SAC ¶ 72.  Indeed, even after Defendants instituted their automatic default policy, the Ambit website continued to market the Guaranteed Savings Plan as "[e]lectricity for your home with a guaranteed 1% savings."  SAC ¶ 74.[47]  Plaintiffs were current participants in the Guaranteed Savings Plan and had no reason to suspect that Defendants would institute a policy to deceptively transfer them off of that plan.  Defendants attempt to hide behind their fine print should be rejected.[48] [49]

---

[46] *See also Wise*, No. 11 Civ. 7345, Tr. at 15 (denying motion to dismiss Section 349 and 349-d ESCO consumer class action by applying the standard that "entire mosaic should be viewed rather than each tile separately" and determining that a reasonable consumer may be misled by the ESCOs statement that its rates are competitive market rates); *Murray Space Shoe Corp. v. FTC*, 304 F.2d 270, 272 (2d Cir. 1962) ("In deciding whether petitioner's advertising was false and misleading we are not to look to technical interpretation[s] of each phrase but must look to the overall impression these circulars are likely to make on the buying public. And statements susceptible of both a misleading and a truthful interpretation will be construed against the advertiser.") (citations omitted).

[47] "In addition to considering the specific act or practice alleged to be deceptive, courts also look to see if defendants' general business practices reinforce the alleged misleading effect."  *Watts v. Jackson Hewitt Tax Serv. Inc.*, 579 F. Supp. 2d 334, 348 (E.D.N.Y. 2008).

[48] Defendants' disclosure arguments also completely ignore that Plaintiff Kalatizadeh was defaulted out of the Guaranteed Savings Plan *before* the TOS even included the automatic default. SAC ¶¶ 8, 75.  It is impossible that the information concerning the Variable Plan was "fully disclosed" to this Plaintiff.

[49] The cases Defendants cite in their brief are inapposite because unlike Plaintiffs here who were *current* customers on the Guaranteed Savings Plan, all of the plaintiffs in Defendants' cases were entering into a new business relationship at the time of the purported disclosures.  In *Hines v. Overstock.com, Inc.*, the plaintiff knew she was purchasing a product from Overstock.com when she failed to read the return policy that disclosed the challenged restocking fee.  No. 09 Civ. 991, 2013 WL 4495667, at *4 (E.D.N.Y. Aug. 19, 2013).  In *Lebowitz v. Dow Jones & Co.*, the plaintiffs contended that they should have been advised *before* they prepaid for their subscriptions that Dow Jones was considering spinning off Barron's Online into a separate service that would no longer be part of the Wall Street Journal online service.  508 F. App'x 83, 85 (2d Cir. 2013).  The *Lebowitz* plaintiffs' subscriber agreement, however, explicitly permitted Dow Jones to eliminate Barron's from its subscription package.  *Id.* at 84.  In *Zuckerman v. BMG Direct Mktg., Inc.*, the plaintiffs challenged a mail order seller's shipping and handling fees, which were properly disclosed in the seller's promotional materials.  737 N.Y.S.2d 14, 15 (2002).  The *Zuckerman* defendant did not saddle its current customers with a deceptive program to extract greater fees.  *Id.*  Finally, in *Shovak v. Long Island Commercial Bank*, the broker's fee was set forth in the brokerage agreement negotiated between the parties.  50 A.D.3d 1118, 1119 (N.Y. App. Div. 2008).

Next, Defendants argue that they had no duty to disclose to customers that the rates charged under the Variable Plan are higher than the rates a customer's existing utility charges. Defs.' Br. 26. This is not true. Defendants' failure to disclose the truth about its prices renders misleading its statements about the savings customers were "guaranteed." *Wise*, No. 11 Civ. 7345, Tr. at 15-16 (failure to disclose that ESCO's variable plan rates were higher rendered misleading the marketing that portrayed rates as comparable to prevailing market rates). Indeed, it is well settled that "[w]hen a defendant exclusively possesses information that a reasonable consumer would want to know and could not discover without difficulty, failure to disclose can constitute a deceptive or misleading practice." *See, e.g.*, *Watts*, 579 F. Supp. 2d at 347-49. Defendants are in possession of the fact that it charges consumers substantially more under the Variable Plan, and consumers only discover this information after they have been charged Defendants' exorbitant rates. Defendants' failure to disclose this information is deceptive.[50]

Finally, Defendants claim that their delay of a refund check *for over a year* for a 1% refund (SAC ¶¶ 68-71) is not deceptive because Plaintiffs fail to show an agreement obligating Defendants "to issue an instantaneous refund." Defs.' Br. 28. Defendants' analysis is lacking. The prohibitions of deceptive acts under the General Business Law "on their face apply to virtually all economic activity, and their application has been correspondingly broad. The reach of these statutes provides needed authority to cope with the numerous, ever-changing types of

---

[50] Defendants other contentions concerning the materiality of a "rate change" and their purported disclosure of variable prices on the third-party 'power to choose" website are completely off base. Defs.' Br.26-27. Whether the rates were adequately disclosed on a third party website, which Plaintiffs contest, does not speak to the lack of disclosures related to the effects of falling prey to Defendants' automatic default policy. Further, Defendants failure to disclose the higher rates was clearly material. A deceptive practice is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *Bildstein v. MasterCard, Int'l, Inc.*, 329 F.Supp.2d 410, 414 (S.D.N.Y. 2004). Defendants' reliance on the PSC regulations concerning contract renewal is misplaced the reasons set forth *supra* p. 28 because the default policy is not a mere "rate change."

false and deceptive business practices which plague consumers in our State." *Karlin v. IVF Am., Inc.*, 93 N.Y.2d 282, 290-91 (1999) (internal citations and quotations omitted). Accordingly, business can commit a deceptive act when, in order to save money, it fails to timely comply with its consumer obligations. *See Wilner v. Allstate Ins. Co.*, 71 A.D.3d 155, 165 (2010) (insurer's delay in fulfilling obligation to initiate suit on behalf of consumer plaintiffs in order to shift initiation costs onto consumers is actionable under Section 349).[51]

### F. Plaintiffs' Unjust Enrichment Claims Should Not Be Dismissed.

Defendants argue that a valid contract between the parties defeats an unjust enrichment claim. Defs.' Br. 29. But Defendants' Section 349-d violations invalidate these contracts. *See* 349-d(8). Moreover, the Classes include all customers during the applicable six-year statute of limitations period who were deprived of the 1% Savings Guarantee. SAC ¶ 128. Many of these consumers were not subject to the TOSs applicable to Plaintiffs. Accordingly, because Defendants have not placed these contracts in the record the Court cannot begin to assess Defendants' assertions concerning these Class members. Further, while unjust enrichment is an unavailable where an adequate remedy at law exists, here the Class members who were deprived of their guaranteed savings prior to the expiration of Sections 349's three year statute of limitations do not have an adequate remedy at law and it would be unjust not to disgorge Defendants of these ill-gotten gains. Plaintiffs' unjust enrichment claims should be sustained.

### CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss Plaintiffs' well-pleaded Second Amended Complaint should be denied.

---

[51] *See also State by Lefkowitz v. Bevis Indus., Inc.*, 63 Misc. 2d 1088, 1090 (Sup. Ct. 1970) (deceptive conduct alleged when seller advertises products with no substantial probability of timely delivery and excessively delays making refunds when merchandise advertised and ordered is not available).

Dated: February 14, 2014
Armonk, New York

Respectfully submitted,

By: _____/s/_____

Steven L. Wittels (SW-8110)
J. Burkett McInturff (JM-4564)

**WITTELS LAW, P.C.**
18 Half Mile Road
Armonk, New York 10504
Telephone: (914) 319-9945
Facsimile: (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com

*Lead Counsel for Plaintiffs and the Class*

**THE ROTH LAW FIRM, PLLC**
Richard Roth (RR-5538)
295 Madison Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 542-8882
Facsimile: (212) 542-8883
rich@rrothlaw.com

*Co-Counsel for Plaintiffs and the Class*

36

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via electronic mail this 14st day of February, 2014 upon the following counsel of record:

Michael W. Stockham
Stephen C. Rasch
Gabrielle Farina
THOMPSON & KNIGHT LLP
1722 Routh Street, Suite 1500
Dallas, Texas 75201-2533
Telephone: (214) 969-1700
Facsimile: (214) 969-1751
Michael.Stockham@tklaw.com
Stephen.Rasch@tklaw.com
Gabrielle.Farina@tklaw.com
***Counsel for all Defendants***

___/s/  Steven L. Wittels_____
        Steven L. Wittels